THE STATE, HENRY GAINES, PROS., v. THE HUDSON COUNTY AVENUE COMMISSIONERS.

1. The legislature cannot leave it to a board of commissioners to determine in what proportion the expense of laying out and opening a public avenue shall be imposed on the townships of a county or wards of a city.
2. Such act of taxation must itself distribute the burthen or prescribe the standard by which such distribution is to be made.
3. An act authorizing the making of a public avenue and directing the commissioners to have a map made of such avenue, and which then provides a specified mode by which the moneys to pay for the expense of the project are to be raised, will not be sustained with respect to the making of the map, if the plan for providing such moneys turns out to be illegal.
4. A land owner is so far injured by the mapping out of such avenue, that he is entitled to have the judgment of the law, on the project, without waiting until his property is attempted to be appropriated in point of fact.
5. The case of *The State* v. *Seymour*, 6 *Vroom* 47, commented on and explained.

On *certiorari.*

Argued at November Term, 1873, before BEASLEY, Chief Justice, and Justices DEPUE, WOODHULL and VAN SYCKEL.

For the prosecutor, *J. B. Vredenburgh* and *Gilchrist,* Attorney-General.

For the defendants, *L. Abbett* and *Dixon.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. By an act of the legislature, passed April 4th, 1873, a board of commissioners was constituted, that was designated " The Hudson County Avenue Commissioners." The purpose in view was to open a street or avenue across the county of Hudson. Among the first acts required of these commissioners was that of surveying the route of this road, and, upon a compliance with certain for-

malities, to adopt a location.   This duty has been performed, the course of the avenue having been run out and such survey having been officially approved of.   These are the proceedings brought before this court by the *certiorari* in the present case.

The staple of the argument in behalf of the plaintiffs in *certiorari*, consisted in objections to this procedure, on the ground of sundry defects and informalities in it, which were deemed to be radical and fatal.   I have not found it necessary to look into these questions, inasmuch as my conclusion is, that the law under consideration, cannot be enforced in any mode as at present constituted..   Its confusion and uncertainty, in respects of the utmost importance, would alone, in my estimation, forbid any judicial attempt to put it in force. But, in addition to this defect, it is illegalized from the presence in it, of a delegation to this official body of powers which can be exercised by the legislature alone, and which are not, in their nature, transferable to any other branch of the government or its agents.   As these objectionable characteristics lie upon the surface of this law, and are, to my mind, very obvious, both with regard to their existence and their annulling effect, I shall content myself with little more than a plain statement of them.

The improvement which this law is intended to effect, is to be a costly one, and consequently, the system provided in it for raising the necessary funds, is of importance.   The vital principle of that system is to apportion the expense between the owners of the land proximate to the road within certain limits, and the public.   It is in this apportionment that I find an uncertainty which I deem destructive of the act.

This matter is regulated, principally, by the eleventh section, which is in these words, viz.: "That the money to pay the entire cost of *laying out and opening* the said avenue shall be raised by assessing the same upon all lands lying within two thousand feet of the centre line of said avenue, and in such proportion, upon such piece and parcel of land, as in the opinion of the commissioners of assessment shall be equal

to the benefit received, and that the money necessary to pay the entire cost and expense of *executing this* act *and of constructing said* avenue shall be borne by the public at large, of the county of Hudson," etc.

It thus appears that the land owners are to pay, in the legislative phrase, "the entire cost of laying out and opening the said avenue." I think it is not possible to say, with the least approach to certainty, what is embraced, in view of the context, in that description. It may comprise nearly the whole expense of the enterprise, or but an inconsiderable fraction of it. To "lay out" the road seems to be effected when a survey has been made and formally adopted by the board of commissioners. The cost of this part of the business would be comparatively nominal. Thus far the definition of the apportionment is perhaps ascertainable. But it is not so with the rest of the descriptive terms. What portion of the cost · is to be assigned, within the sense of the statute, to the work of "opening the said avenue?" This expression will bear either of two interpretations. First, to open the avenue may mean to admit the public to its use. When a road is so far put in order as to be fit for travel, it is thrown open. To open in this sense is a mere ceremony, unattended with any expense. If the phrase is to be received in this sense, then the quota of expense to be borne by the land owners is a mere trifle, for, substantially, it would not embrace anything but the outlay in making the survey of the route of the road. The second meaning which may be given to this expression of "opening the said avenue" is, that it denotes the operation of clearing the avenue of obstructions. This is the sense in which the term "to open," as applied to the construction of public highways, is used in our road acts. By force of that legislation the surveyors of the highways lay out the roads, and the overseers "open" them. The term "to open," in this connection, obviously means to clear away the obstructions in the road. In other words, it implies the actual physical act of unclosing the highway for the public use, and not the mere form of giving it to the public in its finished condition. The

application of this latter signification to the terms in question would result in putting on the land owners, as their entire contribution to this costly project, the expense of making a survey and that occasioned in the removal of the obstructions from the avenue. I think it very dubious whether other expenses could, by force of this language, be imposed on this class of persons; and yet it is probable, from indications in several other sections of .this law, that it was the legislative design to make their burthen much heavier. The phraseology is so obscure that it scarcely affords a ground for a rational conjecture with respect to the intent of the lawmakers.

And this uncertainty is, if possible, increased when we apply ourselves to the apportionment of the expense to the public, in this same section. The paragraph, in this regard, is in these words: "And that the money necessary to pay the entire cost and expense of executing this act, and of constructing said avenue, shall be borne by the public," etc. Now, the phrase, "the entire cost and expense of executing this act," would seem to embrace all disbursements to be made in putting the legislative design into effect. But the penman of this statute seems to have thought that the expense "of constructing said avenue" was not a part of "the cost and expense of executing" the act. Such a use of language can serve no purpose but to construct a puzzle of words. This paragraph, couched in terms that are so comprehensive as to embrace every part of the expense, certainly sheds no light by which the obscurity in the antecedent clause can be dispelled. The principal source of expense in putting this law into effect would be the recompense due to the land owner, from the taking or injuring his land and destroying the buildings upon it. Is the public, or are the land owners to make good this loss? There is an *a priori* probability, arising from the usual practice in this state, that it was the design to place this heavy load on the lands in the vicinity of this improvement, to the extent to which they would be especially benefited. There are even hints of such a purpose interspersed throughout this law, but they are mere hints and nothing more. With

reference to this important subject, I can find nothing in this act on which a trustworthy judgment is to be based. The section which I have critically examined is plain with respect to its plan, that is, to divide, in some uncertain ratio, the expense of the project between the owners of certain lands and the public. With this clear intent section seventeenth is in direct conflict. The purpose of this latter section is to enable the work to be done in sections, and it then contains this incongruous provision, that after "any section is completed and finished, said board may appoint commissioners of assessment on said section, and the costs of such improvement on said section may be assessed upon the property benefited thereby, in proportion to the benefit received, notwithstanding the entire improvement may not be completed." In the previous section the expenses of the improvement were allotted partly to the land owner and partly to the public; but in this section they are put exclusively on the land owner. In the course of the argument it was assumed that it was, in fact, the legislative design to burthen the owners of the land designated with the entire cost of the project, in case the commissioners determined to do the work in sections; but I think there is no reasonable ground for such a supposition. It was obvious that in the execution of so extensive an enterprise, the work would, almost of necessity, have to be done in parts, and if it was inequitable to charge the whole expense on the land owner when the whole work was done as an entirety, it was equally so in case it was done in sections. It would be sheer absurdity and caprice to shift the burthen of the expense on such a ground, and that such was not the idea of the legislator is clearly apparent from the succeeding section of this same law, for in that it is declared that when the avenue is thus made by piecemeal "the assessments for said opening and taking of lands, and for damages and expenses thereof, are to be made in the same way and manner as if the whole of said avenue was opened at the same time." I think it plain, therefore, that by this seventeenth section a different plan, with regard

to the distribution of the burthens, was not meant to be interposed, but that the sections stand with, apparently, cross purposes, in consequence of the carelessness with which they have been framed. The upshot is, that as these sections have been enacted, the legislative purpose, on this essential matter, is involved in so much uncertainty that it is impossible, judicially, to put it into force.

The only other objection to these proceedings which I shall notice, arises out of the provisions of the eleventh section of the same law, and which is the same section to which the foregoing criticism mainly relates. I now refer to the last clause of this section, being that part of it which contains the direction for the raising of the quota of expenses, be they what they may, which is laid upon the public. The language is this: that such expenses " shall be raised by tax on all lands in the county of Hudson, and on goods and chattels therein owned by residents thereof; the proportion of such tax to be raised on the lands, goods and chattels in any township or ward of any city or town shall be determined by the said commissioners, and shall be included by the board of chosen freeholders of the county of Hudson, in the amount of tax to be raised for county purposes," &c.

By force of this language it does not seem possible to avoid the conclusion that the legislature intended to leave the apportionment of this tax to the discretion of these officers. The words used seem incapable of bearing any other interpretation. The quota of each township is to be " determined" by the commissioners. How determined? The statute is silent upon the subject, and it appears a sheer interpolation to imply that such determination is to be made in any particular mode, or is to be regulated by any fixed standard. The reason why such an intendment cannot be raised up is, because there is nothing in the statute upon which it can rest. It was suggested on the argument that the purpose was that this official body, thus designated, should perform, with respect to this apportionment, the duty in a similar matter, incumbent on the board of assessors in the several counties.

This means that the act impliedly requires the commissioners to apportion the tax among the townships in proportion to the value of their ratables respectively.   The difficulty in the adoption of this argument is, in the first place, that it is imposing a restriction on the power of the commissioners to determine the distribution, which is not found in this law. The terms used are plain and unambiguous, and are not in any degree controlled by the context, and I do not know how, by construction, a court of law can curb or check the legislative will thus expressed.   But, in the second place, the argument in question will not coincide with the other provisions of this act.   How is this board of commissioners to ascertain the taxable property in the several townships ?   No power is given to call the several assessors before them, or to institute any inquiry.   But, more than this, the lists of the assessors, if placed in their power, would not enable them to make the allotment in the manner proposed ; for this act, now under consideration, does not impose the tax upon the same property as is embraced in the general taxation of the county. This statute places the tax we are considering on the " goods and chattels " owned by residents of the county.   The general law regulating the subject, imposes the burthen on the personal property, not only of residents, but on that of non-residents of the state.   The statute is clear on this head, and this is a feature in it reasonable enough, as it might well have been deemed an act of simple justice to exempt all persons whose residence was out of this state from any contribution to an enterprise which was designed to be a permanent improvement to the county.   The result is, that the lists of the assessors could not be taken as the standard in making the apportionment in question, for the plain reason that such lists comprise property which, under this statute, is not subjected to any charge.   It seems to follow, therefore, as a necessary deduction, that it could not have been the legislative design to place these commissioners, *pro hac vice*, in the place of the county board of assessors.

Before turning from this particular topic, it may be well

to remark, as a further evidence of the crudeness of this act, and the impossibility of carrying its provisions into effect, that, although the tax which it authorizes is limited to certain property, it directs that, after the quotas to be imposed on the townships have been ascertained by the commissioners, " they," in its own language, " shall be included by the board of chosen freeholders, in the county of Hudson, in the amount of tax to be raised for county purposes." That is, in other words, that, although this particular tax has been imposed exclusively on the property of residents of the county, it shall be collected out of the property in the county, inclusively of residents in the county and non-residents of the state. For the purpose of assessing the tax, persons residing out of the state are to be excluded; but for the purpose of levying such tax, they are to be included. Such incongruities are everywhere presenting themselves in the various sections of this law.

But, from what I have said, I think it must be, upon careful consideration, conceded that a power unchecked, except by the obligations of fairness and a reasonable discretion, is vested in this body of persons to distribute this tax according to its judgment of what is just and right, among the various townships in this county. Holding this opinion, it seems to me necessarily to result that this act cannot be enforced. The reason of this conclusion is, that the legislature has transferred to these commissioners a part of the law making power. A legislative act of taxation, in order to be legal or effectual, must consist of something more than a mere declaration that a certain sum of money shall be raised out of the property within a county. Itself must distribute the burthen. This is as essential as the designation of the amount to be raised. And not only the sum required must be stated, and the property out of which it is to be made designated, but also some certain standard of assessment must be established. No act of taxation can omit any of these components. If the legislature of this state should ordain that a tax of a certain amount should be levied, to be distributed among the counties of the

state, in such proportions as the treasurer, in his discretion, should direct, it would not probably be denied by any one, that such an act would be entirely inoperative. The act in question, according to the only construction that seems to me admissible, is of this character, and is therefore so clearly imperfect as an act of taxation that it must be judicially regarded as a nullity.

Upon the argument, certain considerations were pressed upon our attention with a view of showing that the proceedings already taken by the commissioners in laying out this avenue, should not be annulled, even on the assumption that the statutory provisions touching the raising of money in the methods appointed, should be held to be illegal.

In this respect it was said in the first place, that if the road has been properly laid it should not be obliterated or avoided, on the ground that certain subsequent proceedings prescribed in the statute, cannot be carried into effect. But I can find nothing reasonable in such a position. The project cannot be carried through, or made in any extent available, unless the money necessary for it can be raised. This official survey, brought before us by this writ, is and must remain under the law in its present state, a mere dead letter, so far as the public is concerned, but it is and must be a very serious encumbrance upon the property which it traverses. As long as this map shall remain upon the public records, threatening the property which it embraces, with the realization of the scheme of which it forms a part, so long there is every reason to believe the property will have its value affected in the market. Besides, in the act itself, there is a provision that if the owner, after this laying out, shall improve any part of the land included in the survey, he shall not be entitled to have such improvements included in the estimate of damages to be awarded to him on the taking of his property. I do not think the law will permit a land owner to be held at such disadvantage. This adopted survey constitutes something very like a conditional lien upon this land, and that lien cannot, with any sort of justice, be suffered to remain in the illusive

anticipation of future legislation.   In the present condition of things, the party prosecuting in this case, suffers an immediate injury and is entitled to immediate relief.   Besides, I think this survey and choice of the route of this highway, could not, under this law, be legitimately made, unless at the time of doing such act, it was known where the expense was to fall.   Notice is required to be given of the route as projected, and before its adoption, so that the land owners may be heard upon the subject.   To an intelligent exercise of such privilege, a knowledge of what part of the cost of the improvement was to come upon him, would seem to be requisite. Nor does it appear how the commissioners could perform, in a satisfactory manner, this initial duty without some definite notion upon the subject of the distribution of the expense. Nor do I think the cases cited give any force to this point. The decision in the case of *Morgan* v. *The Monmouth Plank R. Co.*, 2 *Dutcher* 99, promulgates but the ordinary rule, that a statute may be unconstitutional in some particulars and valid as to others.   This is readily granted, but the principle does not embrace a case where the illegal element so permeates the entire law that no part of it can be put into effectual operation.   The vice of this statute now under judgment is of this latter character.   The plan of taxation failing, the survey and its adoption become unprofitable to the public, and, as I have said, injurious to the land owner.   The other case cited on this head was that of *Bonaparte* v. *Camden and Amboy Railroad Company, Bald.* 205.   This authority has no application to such a proceeding as the present.   It was an application for an injunction, which rests in quite different considerations.   To be successful in such a pursuit, the exigency must be pressing and the threatened damage irreparable.   This prosecutor undoubtedly is pressed by no such exigency, and is exposed to no such damage, and it is to be presumed that he could not obtain the assistance of a court of equity.   But I have entirely failed to perceive how such a consideration is to affect his claim to the present remedy, which is entirely a legal one.

The other point taken is *in pari materia.*

It was insisted that the prosecutor was not entitled to his writ until something more was done than to lay out this highway over his land.   But this proposition, I think, conflicts with a long line of cases, and with the settled practice of this court.   Those cases lay down the rule with much emphasis, that a prosecutor, who desires to set aside the laying out of a public road, must proceed promptly, and, under ordinary circumstances, before the public authorities have incurred any considerable expense in making the improvement.   He is admonished to do this under the penalty of a dismissal of his writ, so soon as such unnecessary outlay appears.   The rule is founded in public utility, and should not be impaired or abandoned.   It is not necessary for me to cite these decisions—there are several of them, and are well known to practitioners.   We were referred to the case of *The State* v. *Seymour et al.,* 6 *Vroom* 47, as a decision resting on an opposite view.   The facts of that case are intricate and not entirely intelligible, but the judgment goes upon the ground that the laying out of the streets in that case was a mere abstract thing, without any capacity of immediate realization, and it is certainly only on this assumption, and on the idea that the proceeding was *sui generis,* that the result can be made to harmonize with the law as expounded in our reports.   But even this adjudication if, it had the scope claimed for it which it certainly cannot have, could not avail these defendants.   I know of no emergency which could call for more prompt action on the part of the prosecutor if he wished to preserve his right to this remedy, than the circumstances in which he was placed.   Every hour of delay would have been perilous to him.   The situation is this, the twelfth section of this statute enacts that as soon as the survey of the route of the avenue is made and approved, the board of commissioners may apply to the board of chosen freeholders of the county, as necessity may require, for the issue of bonds in order to provide the means necessary to execute the act. The restriction on this power is that the principal sum of such

bonds shall not exceed two millions of dollars.  In view of such a provision, how can it be said that this prosecutor could have, with safety to himself or to the public, remained quiescent even for a day.   I think it would be a most unwise and dangerous doctrine for this court to say that this writ, under such circumstances, is premature.

For the reasons stated, this statute, in my opinion, is inoperative, and all proceedings taken under it must be set aside.